140 Nev., Advance Opinion 41

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

CHRISTOPHER DEANGELO PALMER,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 86560-COA

**FILED**

JUN 27 2024

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of battery constituting domestic violence—strangulation, false imprisonment, pandering, misdemeanor assault constituting domestic violence, and misdemeanor battery constituting domestic violence. Eighth Judicial District Court, Clark County; Joseph Hardy, Jr., Judge.

*Reversed and remanded.*

F. Virginia Eichacker, Special Public Defender, and Melinda E. Simpkins and Julian Gregory, Chief Deputy Special Public Defenders, Clark County, for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Karen L. Mishler, Chief Deputy District Attorney, Clark County, for Respondent.

BEFORE THE COURT OF APPEALS, GIBBONS, C.J., and BULLA and WESTBROOK, JJ.

24-22322

## OPINION

By the Court, WESTBROOK, J.:

The Sixth Amendment guarantees every criminal defendant the right to a public trial. This public trial right helps ensure that the defendant will be tried fairly, that the trial court and the prosecutor "carry out their duties responsibly," and further "encourages witnesses to come forward and discourages perjury." *Waller v. Georgia*, 467 U.S. 39, 46 (1984). The public trial right is considered so fundamental that a violation constitutes structural error when preserved for appellate review. *See Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017); *Jeremias v. State*, 134 Nev. 46, 47, 412 P.3d 43, 46 (2018).

Before a court may exclude members of the public from a criminal trial, it must satisfy the four-factor test articulated by the United States Supreme Court in *Waller* and adopted by the Nevada Supreme Court in *Feazell v. State*, 111 Nev. 1446, 1449, 906 P.2d 727, 729 (1995). In *Feazell*, the supreme court concluded that a partial courtroom closure was justified by a witness's fear for her personal safety after applying the four-part *Waller* test. Since *Feazell* was decided nearly 30 years ago, Nevada's appellate courts have never addressed in a published decision the circumstances under which a partial closure would *not* be justified. We take the opportunity to do so here and conclude that the trial court violated Christopher Deangelo Palmer's right to a public trial by excluding Palmer's family from the courtroom during the complaining witness's testimony based on her nonspecific "concern" about their presence. Because the district court did not comply with *Waller*, we reverse Palmer's judgment of conviction and remand for a new trial.

 

*FACTS AND PROCEDURAL HISTORY*

This case arises from allegations that Palmer encouraged his then-girlfriend, Wilkeshia Hunter, to engage in prostitution to make money while they were both unemployed. Allegedly, after her first prostitution "date," Palmer told Hunter that she had taken too long and then physically attacked her over the course of several hours. In connection with these allegations, the State charged Palmer with multiple crimes, including: (1) battery constituting domestic violence—strangulation, (2) sex trafficking, (3) first degree kidnapping with the use of a deadly weapon, (4) assault with a deadly weapon constituting domestic violence, (5) coercion constituting domestic violence with the use of a deadly weapon, and (6) misdemeanor battery constituting domestic violence.[1]

Pending his trial, Palmer remained in custody at the Clark County Detention Center for approximately ten months. During this period, Palmer called and spoke with Hunter approximately 400 times, and he also called and spoke with members of his family. These phone calls were recorded. During one call, Hunter told Palmer that she no longer wanted to be in a relationship with him, and on another call, Hunter stated that she was "done" and was "just gonna leave [Palmer] alone." On a third call, Palmer's mother told him that she was going to reach out to Hunter and "guarantee" to her that "when [Palmer] comes home he won't bother you, he won't call you, he won't act like you exist."

Palmer's six-day jury trial began in February 2023. During jury selection, the district court excluded Palmer's brother from the courtroom

---

[1]Palmer was also charged with ownership or possession of a firearm by a prohibited person, but that charge was bifurcated before the jury trial and is not at issue in this appeal.

after he stood up in the gallery and "mumbled something out loud" that some prospective jurors "probably" could hear. Palmer did not object to his brother's removal.

Later that day, the State requested that Palmer's entire family be excluded from the courtroom during Hunter's upcoming testimony. The prosecutor stated that the request was not only based on Palmer's family's actions during the court proceedings, but also because Hunter expressed a general "concern" about the family's presence. Additionally, the State noted a concern of its own:

> The big reason is because [Palmer], through jail calls, had given [Hunter's] number to his mother. To reach out to her. Things of that nature. I'm not trying to say that anybody's threatened her with death or anything like that. I'm not trying to overblow this, Your Honor. But still, it's the course of it and gives the State a lot of concern.

Palmer objected and offered alternatives to courtroom closure, including having his family sit in the back of the courtroom during Hunter's testimony or moving a monitor to block Hunter's view of the family. The district court did not directly address the parties' arguments but stated it would take the matter under advisement, and the State subsequently provided the district court with a recording of the jail call between Palmer and his mother.

Jury selection continued, and at the end of the following day the State renewed its request to exclude Palmer's family from the courtroom during Hunter's testimony, which was scheduled to begin the next day. The State conceded that Palmer's family had not threatened Hunter but argued Palmer's prior phone calls to his mother and to Hunter demonstrated coerciveness:

But when we talk about coercive behavior, as we know, there's a—there's a continuum along a long kind of array of what that can mean. And that's why the State sent over the jail call so Your Honor could listen to it and hear this is the kind of conversation that's going on. Hey, reach out to [Hunter] or hey, let her know. And [Palmer's mother's] like yeah, no, I'm going to let her know that, you know, he's not going to bother you anymore. I mean, all those things it all goes to the coercive behavior. It all goes to what's going on behind the scenes, and not so much behind the scenes because of his 450-400 and some odd calls to the victim. And over and over, this is—it's a full-court press, Your Honor. The full-court press is going, and we could get it from—from the jail call.

So, the State has provided proof on this, and we have shown good cause. This is not something—the State did not go to the victim and say hey, are you scared, do you want us to do this. This is something she asked us about. She's aware of the situation. She's very aware of it, and she has concerns. And I think those are very well-founded concerns. I—if somebody just said hey, I'm—I'm scared of the family, I would tell them, unfortunately, it's an open courtroom and we can't do anything about that. And listen, I've had that happen plenty in my career.

But in this case, that's not what happened here. We're having somebody express a concern because this is a family that has been reached out to by the Defendant as we can hear on the jail calls to reach out to the victim. They—they dated for eight months, the Defendant and the victim, so everybody knows each other. And that's what we hear on that jail call. . . . [I]f you're going to work on dissuading witnesses, I think you forfeit your right to sit—get the right to sit down and hear that witness testify and stare at them from the back of the courtroom.

In response, Palmer argued that there was no evidence of witness dissuasion and that the number of jail calls was not coercive because Hunter accepted all of them. Palmer further argued there was no evidence that his family had threatened Hunter or that his mother ever did, in fact, reach out to Hunter. Ultimately, the district court decided to exclude Palmer's family during Hunter's testimony, citing the "totality of the circumstances," including its need to maintain "control in the courtroom," the misbehavior of Palmer's brother during jury selection, the jail calls between Palmer and Hunter, and Palmer's alleged request for his mother to reach out to Hunter.[2]

During Hunter's testimony, she acknowledged she had extensive contact with Palmer while he was at the Clark County Detention Center. Hunter stated that she accepted Palmer's numerous phone calls after his arrest, went to the detention center to conduct video visits with him, and put money on his books.

At the conclusion of trial, the jury found Palmer guilty of (1) battery constituting domestic violence—strangulation, (2) pandering, (3) gross misdemeanor false imprisonment, (4) misdemeanor assault constituting domestic violence, and (5) misdemeanor battery constituting domestic violence. The court sentenced Palmer to an aggregate prison term of four to ten years with credit for time served on all misdemeanor and gross misdemeanor offenses. On appeal, Palmer argues that the district court violated his Sixth Amendment right to a public trial by excluding his family during Hunter's testimony. We agree, and therefore reverse and remand for a new trial.

---

[2]It does not appear that Hunter provided a statement or otherwise participated in the State's request to exclude Palmer's family.

*ANALYSIS*

The Sixth Amendment provides that a criminal defendant shall enjoy "the right to a . . . public trial." In *Waller v. Georgia*, the United States Supreme Court recognized that this right "may give way in certain cases to other rights or interests" and set forth a four-factor test that must be met before a court can completely exclude the public from criminal trial proceedings. 467 U.S. at 45. First, the trial court must find that "the party seeking to close the hearing [has advanced] an overriding interest that is likely to be prejudiced;" second, "the closure must be no broader than necessary to protect [the overriding] interest;" third, "the trial court must consider reasonable alternatives to closing the proceeding;" and fourth, the trial court "must make findings adequate to support the closure." *Feazell*, 111 Nev. at 1448, 906 P.2d at 728-29 (second alteration in original) (quoting *Waller*, 467 U.S. at 48). However, when a court only partially closes the proceedings, the court must find a "substantial reason" to justify the closure, instead of an "overriding interest." *Id.* at 1448, 906 P.2d at 729 (internal quotation marks omitted).

When properly preserved, a violation of a defendant's Sixth Amendment right to a public trial, whether due to a full or partial courtroom closure, is structural error. *Jeremias*, 134 Nev. at 47, 412 P.3d at 46. Thus, the error "entitles an appellant to automatic reversal of his judgment of conviction without an inquiry into whether the error affected the verdict." *Id.*

In this case, because the district court temporarily excluded Palmer's family during Hunter's testimony without closing the courtroom completely, "it is appropriate to apply the less stringent 'substantial reason' test to determine whether a defendant's right to a public trial was violated." *Feazell*, 111 Nev. at 1448, 906 P.2d at 728 (quoting *Woods v. Kuhlmann*,

977 F.2d 74, 76 (2d Cir. 1992)). Therefore, when addressing the first *Waller* factor, this court must determine if there was a "substantial reason" to justify excluding Palmer's family. Palmer argues that Hunter's "amorphous concern" did not justify closure and was insufficient to override his Sixth Amendment right to a public trial.

What constitutes a "substantial reason" is not subject to a bright-line rule and varies based on the facts and circumstances of each case. However, the presence of a defendant's family and supporters is of particular importance. "[W]ithout exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." *In re Oliver*, 333 U.S. 257, 271-72 (1948); *see also Presley v. Georgia*, 558 U.S. 209, 216 (2010) (reversing an appellant's conviction for drug trafficking because his uncle was wrongly excluded during voir dire); *Carson v. Fischer*, 421 F.3d 83, 91 (2d Cir. 2005) (recognizing a "heightened interest in the exclusion of family members and friends"). With this in mind, we turn to the reasons offered by the district court to exclude Palmer's family: maintaining courtroom control, the misbehavior of Palmer's brother, and Palmer's jail calls to Hunter and to his mother. We conclude that none of these reasons justified the partial courtroom closure in this case.

The first reason given—courtroom control—did not justify excluding Palmer's family because nothing in the record indicated that closure was necessary due to Palmer's family being disorderly or failing to maintain courtroom decorum during the trial. Further, the district court did not explain why excluding Palmer's entire family was necessary to maintain courtroom control. *See, e.g., People v. Richardson*, 744 N.Y.S.2d 407, 407 (App. Div. 2002) ("The trial court's exclusion of defendant's

children, ages eight and nine, from the courtroom violated defendant's right to a public trial, there being no support in the record for the contention that the children were being disruptive."); *cf. Clemons v. State*, 720 So. 2d 961, 971 (Ala. Crim. App. 1996) (concluding the defendant's Sixth Amendment right was not violated by closing the courtroom after several individuals in the audience began causing disruptions during trial and "the record show[ed] clearly that the judge closed the courtroom doors to preserve order and decorum"). Because the district court did not address why the exclusion was necessary to exercise courtroom control, nor was it apparent in the record, this was not a substantial reason to justify closure.

The second, and related, reason given was the prior exclusion of Palmer's brother during jury selection. However, Palmer's brother had *already* been excluded from the courtroom, and the district court did not explain why the brother's previous removal warranted excluding Palmer's entire family, particularly when no other family members caused similar interruptions during the trial and the closure was only during Hunter's testimony. *Cf. Woods*, 977 F.2d at 77 (upholding the exclusion of the defendant's entire family because the trial court expressly "considered, but dismissed as ineffective, the possibility of removing only the family members who threatened" the witness). Thus, this was also not a substantial reason to justify closure.

The next reason provided was the high number of calls between Palmer and Hunter. While the State argued that the sheer volume of calls between Palmer and Hunter was "coercive," Palmer responded that Hunter voluntarily accepted all of these calls and visited Palmer at the detention center. Hunter's subsequent testimony confirmed that she did in fact voluntarily accept Palmer's calls and visit him, and she did not testify that

she felt coerced or threatened at any time following Palmer's arrest. We disagree with the State's position, which it reasserts on appeal, that a large number of calls between two willing participants alone, without any reference to the calls' substance, is inherently coercive. Further, it is unclear from the record why the high number of calls between Palmer and Hunter would justify excluding Palmer's *entire family*, and the district court did not provide an explanation on this point.[3] Therefore, the number of calls between Palmer and Hunter did not constitute a substantial reason to justify the partial closure.[4]

The final reason offered by the district court was the jail call between Palmer and his mother. During this call, Palmer purportedly gave

---

[3]We recognize that the charges in this case involved domestic violence and sex trafficking and that the court could properly consider the relationship between Palmer and Hunter when evaluating the existence of coercion by Palmer. *Cf. Bigpond v. State*, 128 Nev. 108, 118, 270 P.3d 1244, 1250 (2012) (recognizing that a "victim's prior accusations of domestic violence were relevant because they provide insight into the relationship and the victim's possible reason for recanting her prior accusations"). But the State presented no argument or evidence below to suggest that Palmer's *family* was part of a team trying to prevent her from testifying.

[4]Shortly before Hunter testified, the State made a record that Hunter had received a text message that morning from an unknown number that said, "twenty to life, don't go to Court." The district court excluded the text message from evidence because the sender was unknown, and the court reasoned that introducing the text message to the jury created a risk the jury would improperly speculate that Palmer or someone connected to him sent the message. On appeal, the State contends that this text message justified the courtroom closure, but the message was sent a day *after* the district court announced its decision to exclude Palmer's family. In addition, to rely on the text message to retroactively justify the courtroom closure would require this court to speculate that the message originated from Palmer's family when the district court expressly rejected that conclusion.

Hunter's phone number to his mother, and his mother stated that she would reach out to Hunter and tell her that Palmer would not bother her anymore. The State argued to the district court that Hunter had a general "concern" with Palmer's family being present in the courtroom because of this call.[5] On appeal, however, the State specified that Hunter was concerned for her "personal safety" and that her concern about personal safety was a substantial reason to justify the courtroom closure.

A witness's fear for her personal safety may be a substantial reason to warrant a courtroom closure. *See, e.g., Feazell*, 111 Nev. at 1447-49, 906 P.2d at 729. However, whether a closure is justified due to a witness's fear frequently turns on whether objective evidence exists in the record to establish that witness's fear, which may include evidence of direct or indirect threats. *See United States v. Farmer*, 32 F.3d 369, 372 (8th Cir. 1994) (finding a partial closure was justified when there was evidence in the record showing that the defendant had threatened the complaining witness and the witness feared retaliation by the defendant and his family); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989) (concluding that a partial closure was justified because the record showed "clear references to [the

---

[5]The recording of the jail call was transmitted to this court as an original trial exhibit. The call was largely unintelligible, and, upon our review, we were unable to discern that Palmer gave his mother Hunter's phone number. While Palmer's mother did offer to reach out to Hunter, it was unclear if Palmer requested that contact, but in any event, there was no indication in the record that Palmer's mother actually contacted Hunter. Further, the call neither contained any facially threatening or coercive remarks directed at Hunter, nor was there anything apparent in the call that would support a finding of witness dissuasion, as argued by the State. *See* NRS 199.230 (defining witness dissuasion, in pertinent part, as attempting to or preventing another person from testifying "by persuasion, force, threat, intimidation, deception or otherwise").

witness's] fear or concern" about other assailants who had not been apprehended, the defendant and defendant's family knew where the witness lived, and the police advised the witness to buy a gun); *cf. Garcia v. Bertsch*, 470 F.3d 748, 753 (8th Cir. 2006) (declining to grant postconviction relief but noting that, had the issue come before the panel on direct appeal, it may not have found the closure justified where the witness "did not say why he was reluctant to testify. The trial court did not hold an evidentiary hearing to clarify the reasons for [his] silence. As such, there is no evidence in the record of any specific threats against him personally, or against his family members.").

In *Feazell*, an eyewitness refused to testify unless the district court excluded four African-American men from the courtroom "whom she felt posed a threat to her personal safety." 111 Nev. at 1447, 906 P.2d at 728. The witness informed the court that she felt threatened specifically "because she had received two telephone calls telling her not to testify and because somebody had left a dead bird in a plastic bag on her patio." *Id.* at 1447-48, 906 P.2d at 728. After the witness identified the individuals she did not want in the courtroom during her testimony, the district court made findings regarding the threats and the witness's concern for her safety and excluded the four men. *Id.* at 1448-49, 906 P.2d at 728-29. The Nevada Supreme Court concluded that the exclusion did not violate Feazell's Sixth Amendment rights because the witness's interest in her personal safety "qualifie[d] as both a 'substantial reason' and an 'overriding interest' sufficient to justify partially closing the trial." *Id.* at 1448-49, 906 P.2d at 729.

In *Woods v. Kuhlmann*, the United States Court of Appeals for the Second Circuit similarly determined that the appellant's Sixth

Amendment rights were not violated when his family was excluded during a witness's testimony. 977 F.2d at 78. The court first observed that, based on the prosecutor's representations, the witness was "'scared to death' because she had been threatened by at least one member of the defendant's family," who had gone to the witness's house "telling her she had better not testify, she had better not go to court." *Id.* at 75-76. Further, immediately before the witness testified, she confirmed to the presiding judge that "she was reluctant to testify because of 'certain fears' that she had for the safety of herself and her family." *Id.* at 75. The Second Circuit found that, while the court's questioning "may not have been exhaustive, we do not doubt that by hearing her answer and observing her demeanor during this exchange, the judge was able to adequately determine for herself the scope of [the witness's] fear of the [defendant's] family." *Id.* at 77.

Unlike in *Feazell* and *Woods*, where the court was advised of the specific, objective reasons why the witnesses feared for their personal safety, the prosecutor in this case did not articulate to the district court *why* Hunter was concerned about the family's presence, nor did the prosecutor offer to have Hunter express her concerns directly to the court. The district court did not have an "exchange" with Hunter to clarify the reasons for her concern, and so the district court was not able to hear her answer or observe her demeanor and could not adequately determine the scope of Hunter's concern. More importantly, the State acknowledged that there were no threats against Hunter.

While the State argues on appeal that Hunter's "concern" was actually a fear for her personal safety, this was not reflected in the district

court record.[6] The State neither proffered, nor did Hunter herself claim, that she was afraid. *Cf. Feazell*, 111 Nev. at 1447-49, 906 P.2d at 728-29; *Woods*, 977 F.2d at 77. To the extent that the State implied that Hunter was concerned because Palmer had given his mother Hunter's phone number during a jail call, the record does not establish that Palmer's mother ever contacted Hunter. This creates further uncertainty and emphasizes the lack of a clear record as to the source of Hunter's "concern" with Palmer's family being present during her testimony. In the absence of a supporting record or factual findings, Hunter's general "concern" was not a substantial reason to justify the partial courtroom closure. Because none of the reasons given by the district court were a "substantial reason" to justify the partial courtroom closure, the first *Waller* factor was not met. *Feazell*, 111 Nev. at 1448, 906 P.2d at 729.

The second *Waller* factor, that the exclusion be "no broader than necessary" to protect the identified substantial reason, was also not satisfied in this case. 467 U.S. at 48. The record is unclear why excluding Palmer's entire family was necessary. *See Guzman v. Scully*, 80 F.3d 772, 776 (2d Cir. 1996) ("The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial,

---

[6]The district court did not find that Hunter's concern was for her personal safety or that Hunter's personal safety justified closure. Rather, the State argued repeatedly that Hunter was "concerned" without ever specifying the nature of that concern, and the district court agreed with the State's argument as it was framed at trial. Though the State asks this court to infer that Hunter's concern was tied to a fear for her personal safety, we decline to speculate about the district court's reasoning for the closure. *See State v. Rincon*, 122 Nev. 1170, 1176-77, 147 P.3d 233, 237-38 (2006) (concluding that when the district court "does not include express findings of fact," the appellate court will not "speculate about the factual inferences" that the district court may have drawn).

is not a step to be taken lightly."). The State's proffered reasons for the exclusion, on their face, applied only to Palmer's mother and brother, but otherwise did not implicate Palmer's other family members. Therefore, even if a substantial reason existed to exclude Palmer's mother and brother from the proceedings, that reason would not automatically apply to Palmer's other family members absent findings to explain the necessity for their exclusion. *Cf. Woods*, 977 F.2d at 77. Without such findings, this court cannot hold that the closure was no broader than necessary to satisfy the second *Waller* factor.

We are also concerned with the lack of consideration given to "reasonable alternatives" to the partial closure under the third *Waller* factor. *Presley*, 558 U.S. at 210 ("[E]ven assuming, *arguendo*, that the trial court had an overriding interest in closing *voir dire*, it was still incumbent upon it to consider reasonable alternatives to closure. It did not, and that is all this Court needs to decide."). Palmer offered two alternatives to exclusion—having his family sit in the back of the room during Hunter's testimony and moving a courtroom monitor to block Hunter's view of his family—and the record does not reflect that the district court considered these, or any other, alternatives to closure. *See id.* at 214 (noting that "trial courts are required to consider alternatives to closure even when they are not offered by the parties"). Because the record does not reflect that the district court considered or addressed the proposed reasonable alternatives to closure, the third *Waller* factor was also not satisfied. *See Feazell*, 111 Nev. at 1448, 906 P.2d at 729.

Finally, the fourth *Waller* factor required the district court to make adequate findings on the record to support its decision. 467 U.S. at 48. In this case, although the district court did make limited findings, it

found that excluding Palmer's family was justified "under the totality of the circumstances," rather than under the four-factor test provided in *Waller*. While the district court identified reasons for the partial closure, as noted above, the record does not support the court's conclusory findings that closure was warranted to maintain courtroom control, to address misbehavior by Palmer's brother, or in light of Palmer's numerous jail calls. Further, the court did not find that excluding Palmer's entire family was no broader than necessary and did not address the proposed reasonable alternatives to closure. Because the record contains no findings that relate to the second and third factors of the *Waller* test, this court cannot make reasonable inferences from the record to support the district court's decision without resorting to speculation. *State v. Rincon*, 122 Nev. 1170, 1177, 147 P.3d 233, 238 (2006).

Because the record does not support that the partial courtroom closure was justified pursuant to *Waller*, the closure violated Palmer's Sixth Amendment right to a public trial, which constitutes structural error necessitating reversal.[7] *Jeremias*, 134 Nev. at 47, 412 P.3d at 46.

## CONCLUSION

The district court violated Palmer's Sixth Amendment right to a public trial when it excluded his entire family from the courtroom during the complaining witness's testimony in contravention of the four-part

---

[7]Palmer also alleges that his Sixth Amendment rights were violated when his brother was removed during jury selection and when the marshal excluded his family at the start of jury selection, even though the district court subsequently corrected the marshal and instructed him to let Palmer's family inside the courtroom. We need not reach these issues given that we reverse on other grounds. *See Miller v. Burk*, 124 Nev. 579, 588-89 & n.26, 188 P.3d 1112, 1118-19 & n.26 (2008) (explaining that this court need not address issues that are unnecessary to resolve the case at bar).

*Waller* test. First, none of the reasons advanced by the State and credited by the court constituted a "substantial reason" to justify the partial courtroom closure. Second, even if a substantial reason existed to justify excluding Palmer's mother and brother, this court cannot find that the closure was "no broader than necessary," as applied to Palmer's entire family. Third, the record does not reflect that the court considered reasonable alternatives to the closure. Finally, the court did not make adequate findings to support the closure. Because the violation of Palmer's Sixth Amendment right to a public trial was a structural error, we reverse Palmer's judgment of conviction and remand for a new trial.[8]

_____, J.
Westbrook

We concur:

_____, C.J.
Gibbons

_____, J.
Bulla

---

[8]Insofar as Palmer raised other arguments that are not specifically addressed in this opinion, we conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.